No. 23-12882-B

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

JAY D. GOULD,
*Plaintiff-Appellant,*

v.

INTERFACE, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Georgia

## BRIEF OF APPELLANT

Keith R. Blackwell
  Georgia Bar No. 024493
John E. Stephenson, Jr.
  Georgia Bar No. 679825
Christopher C. Marquardt
  Georgia Bar No. 471150
Leigh R. Shapiro
  Georgia Bar No. 408330

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

*Counsel for Plaintiff-Appellant Jay D. Gould*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE
STATEMENT**

Pursuant to Eleventh Circuit Rules 26.1-1 *et seq.,* appellant Jay D. Gould certifies that the following persons and organizations have an interest in the outcome of this appeal:

1. Alston & Bird LLP, *counsel for appellant;*

2. BlackRock, Inc. (NASDAQ symbol: BLK), *affiliate of appellee;*

3. Blackwell, Keith R., *counsel for appellant;*

4. Bly, Hon. Christopher C., *United States Magistrate Judge;*

5. Clyde, Thomas M., *counsel for appellee;*

6. Edwards, Whitney Bly, *former counsel for appellant;*

7. Gaither, Lesli Nicole, *counsel for appellee;*

8. Garett, Jr., C. Allen, *counsel for appellee;*

9. Gould, Jay D., *appellant;*

10. Greenberg Traurig, LLP, *former counsel for appellant;*

11. Grimberg, Hon. Steven D., *United States District Judge;*

12. Herbert, Brittany Nash, *counsel for appellee;*

13. Hudson, Stephen E., *counsel for appellee;*

14. Interface, Inc. (NASDAQ symbol: TILE), *appellee;*

15. Khan, Fahad Ali, *former counsel for appellant;*

16. Kilpatrick Townsend & Stockton LLP, *counsel for appellee;*

17. Long-Daniels, David W., *counsel for appellant;*

18. Lumpkin, M. Allyson, *counsel for appellant;*

19. Marquardt, Christopher C., *counsel for appellant;*

20. Poole II, Robert H., *former counsel for appellant;*

21. Shapiro, Leigh R., *counsel for appellant;*

22. Squire Patton Boggs (US) LLP, *counsel for appellant;*

23. Stephenson Jr., John E., *counsel for appellant;* and

24. Wilson, Natasha, *former counsel for appellant.*

Appellant further certifies that appellee Interface, Inc. (NASDAQ symbol: TILE) is a publicly traded company, and to his knowledge, BlackRock, Inc. (NASDAQ symbol: BLK) is the only publicly traded company that owns 10 percent or more of its stock.

/s/ *Keith R. Blackwell*
Keith R. Blackwell
  Georgia Bar No. 024493

C-2

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

C-3

# STATEMENT REGARDING ORAL ARGUMENT

The law that applies in this appeal—principles of contract interpretation under Georgia law and the standards for summary judgment under Federal Rule of Civil Procedure 56—is familiar and settled. The factual record, however, is somewhat complex, and the issues presented—the interpretation of an employment agreement and whether appellee Interface had "cause" under the agreement to terminate appellant Jay D. Gould's employment—were addressed in, but were not the principal focus of, the magistrate judge's report and recommendation on summary judgment and the district court's order adopting the report and recommendation. For these reasons, Mr. Gould respectfully requests oral argument as a means to facilitate the decisional process.

LEGAL02/43330961v6

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF CITATIONS ............................................................... iii

STATEMENT OF JURISDICTION ........................................................ vii

Jurisdiction of the District Court ...................................... vii

Jurisdiction of this Court .................................................. vii

STATEMENT OF THE ISSUES ........................................................ 1

STATEMENT OF THE CASE .......................................................... 1

Statement of the Facts ..................................................... 2

Course of Proceedings and Disposition in the District Court ............. 22

Standard of Review ......................................................... 27

SUMMARY OF THE ARGUMENT ..................................................... 28

ARGUMENT AND CITATION OF AUTHORITY .................................... 30

Mr. Gould's employment agreement does not vest Interface with unreviewable discretion to determine conclusively whether there is cause to terminate his employment ................................... 30

The District Court erred when it found no genuine disputes of material fact as to the existence of cause, and it erred in awarding summary judgment to Interface ............................................ 42

CONCLUSION ............................................................................ 47

CERTIFICATE OF COMPLIANCE .................................................... 48

CERTIFICATE OF SERVICE .......................................................... 49

LEGAL02/43330961v6

# TABLE OF CITATIONS

**Page(s)**

CASES

*Archer W. Contractors v. Estate of Pitts,*
    292 Ga. 219, 735 S.E.2d 772 (2012)......................................................31

*Auriga Polymers Inc. v. PMCM2, LLC,*
    40 F.4th 1273 (11th Cir. 2022) ..........................................................27

\* *Automatic Sprinkler Corporation of America v. Anderson,*
    243 Ga. 867, 257 S.E.2d 283 (1979)....................................34, 35, 36

*Chen v. Tai,*
    232 Ga. App. 595, 502 S.E.2d 531 (1998) ..........................................41

*Cobb Beauty Coll. v. Scamihorn,*
    339 Ga. App. 751, 792 S.E.2d 769 (2016) ..........................................41

*Floyd v. Floyd,*
    291 Ga. 605, 732 S.E.2d 258 (2012)....................................................31

*Ga. Power & Light Co. v. Waycross,*
    181 Ga. 216, 181 S.E. 575 (1935)........................................................31

*Gould v. Interface, Inc.,*
    No. 22-12340 (11th Cir. Dec. 9, 2022) ..........................................viii, 7

*Higgins v. Smith Int'l.,* Inc.
    716 F.2d 278 (5th Cir. 1983)................................................................41

*Huggins v. Lueder, Larkin & Hunter,*
    39 F.4th 1342 (11th Cir. 2022) ..........................................................27

*Hughes v. State,*
    296 Ga. 744, 770 S.E.2d 636 (2015)....................................................44

\* *Jackson v. JHD Dental, LLC,*
    No. 1:10-CV-00173-JEC, 2011 U.S. Dist. LEXIS 63015 (N.D.
    Ga. June 14, 2011) ........................................37, 40, 41, 45

iii

*Kern v. Palmer Coll. of Chiropractic,*
 757 N.W.2d 651 (Iowa 2008).............................................................. 41

*Langley v. MP Spring Lake,*
 307 Ga. 321, 834 S.E.2d 800 (2019)............................................... 30, 34

*Lawrence v. Cue Paging Corp.,*
 194 W. Va. 638, 461 S.E.2d 144 (W. Va. 1995) ................................. 41

*Liese v. Indian River Cnty. Hosp. Dist.,*
 701 F.3d 334 (11th Cir. 2012)........................................................... 10

*Russell v. Bd. of Trs.,*
 243 F.3d 336 (7th Cir. 2001).............................................................. 46

*S. Telecom Inc. v. TW Telecom of Ga.,*
 321 Ga. App. 110, 741 S.E.2d 234 (2013) ........................................ 31

*Savannah Coll. of Art & Design v. Nulph,*
 265 Ga. 662, 460 S.E.2d 792 (1995)................................................. 41

*Schwartz v. Schwartz,*
 275 Ga. 107, 561 S.E.2d 96 (2002).................................................... 31

*Southern-Owners Ins. Co. v. Easdon Rhodes & Assocs.,*
 872 F.3d 1161 (11th Cir. 2017).......................................................... 27

*State v. Gray,*
 267 Ga. App. 753, 600 S.E.2d 626 (2004) ........................................ 44

*Tacket v. Delco Remy,*
 959 F.2d 650 (7th Cir. 1992).............................................................. 41

*Toussaint v. Blue Cross & Blue Shield of Mich.,*
 408 Mich. 579, 292 N.W.2d 880 (Mich. 1980) .................................. 42

*Unified Gov't of Athens-Clarke Cnty v. Stiles Apts.,*
 295 Ga. 829, 764 S.E.2d 403 (2014)................................................. 31

*Va. Props. v. Rose,*
 210 Ga. App. 878, 437 S.E.2d 835 (1993) ........................................ 36

iv

*Waldrop v. Cmty. Health Sys.*,
No. 4:16-CV-0235-HLM, 2017 U.S. Dist. LEXIS 231579 (N.D.
Ga. Aug. 28, 2017) ................................................................. 41

RULES

Eleventh Circuit Rule 28-5 ........................................................... vi

Fed. R. App. P. 4(a)(4)(A)(iv) ..................................................... vii

Fed. R. App. P. 32(a)(5) ............................................................. 48

Fed. R. App. P. 32(a)(6) ............................................................. 48

Fed. R. App. P. 32(a)(7)(B) ......................................................... 48

Fed. R. App. P. 32(f) ................................................................. 48

Federal Rule of Civil Procedure 54(b) ......................................... vii

STATUTES

28 U.S.C. § 1291 ...................................................................... viii

28 U.S.C. § 1331 ....................................................................... vii

28 U.S.C. § 1367 ....................................................................... vii

42 U.S.C. § 2000e-3 ................................................................... vii

O.C.G.A. § 13-6-11 ................................................................... 22

OTHER AUTHORITIES

Connor Riley, *"I want to break them": Kirby Smart goes viral for
incredible, profane Florida halftime speech,* DAWG NATION (Nov.
17, 2021),
https://www.dawgnation.com/football/connor_in_coverage/kirby-
smart-halftime-speech-
florida/V3DPE35NDZH6ZMP6WU6DDX3QWE/ (last visited on
Oct. 26, 2023) ........................................................................ 45

v

DICTIONARY OF MODERN AMERICAN USAGE (1998) .................................. 32

LEGAL02/43330961v6

# STATEMENT OF JURISDICTION

## *Jurisdiction of the District Court*

In the district court, plaintiff-appellant Jay D. Gould asserted a claim under 42 U.S.C. § 2000e-3 for unlawful employment practices, as well as claims under state law for breach of contract, defamation, and breach of a duty to act in good faith. (Doc. 4 at 19-26.)[1] Defendant-appellee Interface, Inc. asserted a counterclaim under state law for breach of fiduciary duty. (Doc. 7 at 48-49.) With respect to the claim arising under federal law, the district court properly exercised jurisdiction pursuant to 28 U.S.C. § 1331, and with respect to the other claims and counterclaim, it properly exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## *Jurisdiction of this Court*

On August 2, 2023, the district court dismissed Interface's counterclaim and entered final judgment. (Doc. 256.) At the time of the

---

[1] Pursuant to Eleventh Circuit Rule 28-5, all record citations are in the following formats: (Doc. [Docket Number] at [Page Number].) or (Doc. [Docket Number] ¶ [Paragraph Number].); for depositions, (Doc. [Docket Number], [Deponent Name] Dep. at [Page Number]:[Line Number].); and for electronic media, (Doc. [Docket Number], [File Name] at [Time Stamp].).

LEGAL02/43330961v6

final judgment, the counterclaim was the only claim still pending in this case, inasmuch as the claims asserted by Mr. Gould previously had been dismissed or adjudicated.[2] Mr. Gould timely filed a notice of appeal on August 31, 2023. (Doc. 257.) Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction of this appeal from the final judgment of the district court. *See also* Fed. R. App. P. 4(a)(4)(A)(iv).

---

[2] Mr. Gould's claim for negligent investigation was dismissed involuntarily (Doc. 92), he voluntarily dismissed his defamation claims (Doc. 127), and the district court awarded summary judgment to Interface on his claims for unlawful employment practices and breach of contract. (Doc. 201.) The district court certified the summary judgment as a partial final judgment under Federal Rule of Civil Procedure 54(b), (Doc. 209), and Mr. Gould appealed. (Doc. 214.) This Court, however, determined that the district court abused its discretion in certifying the summary judgment as final, and it dismissed the appeal as premature. (Doc. 222 (*Gould v. Interface, Inc.,* No. 22-12340 (11th Cir. Dec. 9, 2022).)

LEGAL02/43330961v6

## STATEMENT OF THE ISSUES

1. Whether the district court misconstrued Mr. Gould's employment agreement when it held that the agreement authorized Interface to determine conclusively whether there was cause to terminate his employment.

2. Whether the district court erred when it found no genuine disputes of material fact about whether there was cause for Interface to terminate Mr. Gould's employment and awarded summary judgment to Interface on his claim for breach of his employment agreement.

## STATEMENT OF THE CASE

In January 2020, defendant-appellee Interface, Inc. ("Interface") terminated the employment of its chief executive officer, plaintiff-appellant Jay D. Gould ("Mr. Gould"), ostensibly for cause. Mr. Gould sued Interface, alleging that there was no cause to terminate his employment and that Interface breached his employment agreement by withholding compensation and benefits to which he was contractually entitled in the event of a termination without cause. In the litigation that followed, Interface claimed that it was authorized under the employment agreement to determine conclusively whether there was cause to

LEGAL02/43330961v6

terminate Mr. Gould's employment, and having exercised that authority, no judge or jury could second-guess its determination of cause. Mr. Gould disputed that his employment agreement vested Interface with such unreviewable discretion, and he argued—pointing to conflicts in the evidence, including conflicting eyewitness accounts and video recordings of two incidents at a company retreat, which supposedly formed the basis for the termination of his employment—that the existence of cause is for a jury to decide. The district court awarded summary judgment to Interface on the claim for breach of the employment agreement and dismissed Interface's counterclaim. Mr. Gould now appeals.

## Statement of the Facts

In January 2015, Interface—a publicly-traded manufacturer of commercial carpeting and flooring materials that is headquartered in Midtown Atlanta—hired Mr. Gould as its chief operating officer. (Doc. 174-3 ¶¶ 1–2; Doc. 195 at 4.) Mr. Gould was promoted to president in 2016, and in March 2017, he was appointed chief executive officer. (Doc. 174-3 ¶¶ 2–3; Doc. 195 at 4.) He served as CEO for nearly three years, until Interface abruptly terminated his employment in January 2020, purportedly for cause. (Doc. 195 at 17.)

LEGAL02/43330961v6

*The Employment Agreement.* In connection with his appointment as CEO, Mr. Gould and Interface entered into an employment agreement on March 3, 2017.[3] (Doc. 4-1 at 7; Doc. 174-3 ¶ 5.) The agreement is for a two-year term, and the term renewed daily for so long as Mr. Gould was employed as CEO.[4] (Doc. 4-1 at 8, § 4.) The agreement provides that, during his employment, Mr. Gould would receive an annual base salary (Doc. 4-1 at 18, § 8(a)), an annual incentive bonus (Doc. 4-1 at 18, § 8(b)), stock options (Doc. 4-1 at 18, § 8(c)), and certain other benefits. (Doc. 4-1

---

[3] This agreement is entitled "Amended and Restated Employment and Change in Control Agreement." (Doc. 4-1 at 7.) Throughout his employment with Interface, Mr. Gould worked pursuant to one or more employment agreements, but only the March 2017 agreement—which amended, restated, and effectively superseded his earlier agreements—is at issue in this litigation.

[4] In other words, the agreement was written so as to ensure that the remaining term of the agreement would always be two years. About the term of the agreement, Section 4 provides in pertinent part:

> Subject to the terms of Section 5 hereof, the duration of this Agreement (the "Term") shall be for a rolling, two-year period commencing on [March 3, 2017], and shall be deemed automatically (without further action by either [Interface] or [Mr. Gould]) to extend each day for an additional day such that the remaining Term of this Agreement shall continue to be two years . . . .

(Doc. 4-1 at 8, § 4.)

LEGAL02/43330961v6

at 18-19, § 8(e-j).) The agreement is governed by Georgia law. (Doc. 4-1 at 23, § 10.)

Nearly ten pages of the employment agreement concern the rights and obligations of the parties in the event that Mr. Gould's employment were terminated. (Doc. 4-1 at 8-17, §§ 5-7.) To be sure, the agreement authorizes Interface in "its sole discretion" to terminate his employment for any reason or no reason at all.[5] (Doc. 4-1 at 10, § 5(c).) But if Interface exercised its discretion to terminate Mr. Gould's employment *without* cause, Mr. Gould would be entitled to substantial compensation and benefits for each of the two years remaining in the term of his agreement, including salary in "an amount equal to his current salary"[6] (Doc. 4-1 at 10, § 5(d)(i)), bonus payments in an amount equal to the average of his

---

[5] Section 5(c) provides:

> Subject to the terms of Section 5(d) below, [Interface] may terminate [Mr. Gould]'s employment hereunder, in its sole discretion, whether with or without cause, at any time upon written notice to [Mr. Gould].

(Doc. 4-1 at 10, § 5(c).) Section 5(d) is discussed below and concerns the obligations that Interface owes to Mr. Gould in the event of a termination without cause.

[6] The agreement defines "current salary" as "the highest rate in effect during the six-month period prior to [the] termination of employment." (Doc. 4-1 at 10, § 5(d)(i).)

LEGAL02/43330961v6

bonuses in the two years preceding his termination (Doc. 4-1 at 11, § 5(d)(ii)), a prorated bonus payment for the year in which his employment was terminated (Doc. 4-1 at 11, § 5(d)(ii)), and health, life, and long-term care insurance coverage. (Doc. 4-1 at 11-12, § 5(d)(iii-iv).) The agreement also provides in the event of a termination without cause that any "outstanding stock options shall become vested and thus immediately exercisable" (Doc. 4-1 at 13, § 5(d)(vi)(A)), and "restrictions on all shares of restricted stock . . . awarded to [Mr. Gould] shall lapse, and the affected shares shall become vested." (Doc. 4-1 at 13, § 5(d)(vi)(B).) If, on the other hand, Interface terminated Mr. Gould's employment *with* cause, the agreement provides that Mr. Gould would be entitled only to "such salary, reimbursable expenses and other amounts as may properly be due [Mr. Gould] through [his] last day of employment." (Doc. 4-1 at 14, § 6.)

What amounts to cause is also addressed comprehensively in the agreement. In objective terms, the agreement specifically identifies four circumstances that would give Interface cause to terminate Mr. Gould's employment:

> "Cause" shall mean, for purposes of this Agreement . . . (A) [Mr. Gould]'s fraud, dishonesty, gross negligence, or willful misconduct with respect to business affairs of [Interface] (including its subsidiaries and affiliated companies), (B) [Mr.

Gould]'s refusal or repeated failure to follow the established lawful policies of [Interface] applicable to persons occupying the same or similar positions, (C) [Mr. Gould]'s material breach of this Agreement, or (D) [Mr. Gould]'s conviction of a felony or other crime involving moral turpitude.

(Doc. 4-1 at 8, § 5(a)(i).) Nothing in this contractual definition suggests that Interface has an unreviewable discretion to determine for itself what amounts to cause.

To the contrary, the agreement seems to presuppose that Mr. Gould could challenge determinations made by Interface under the contract. In the event Mr. Gould were required to incur legal fees or other expenses to enforce his rights under the employment agreement, and if he ultimately were successful in enforcing any of those rights, the agreement expressly provides that Interface is required to reimburse his reasonable legal fees and expenses.[7] (Doc. 4-1 at 23, § 11.) The only

---

[7] In pertinent part, Section 11 provides:

In the event [Mr. Gould] incurs legal fees and other expenses in seeking to obtain or to enforce any rights or benefits provided by this Agreement and is successful, in whole or in part, in obtaining or enforcing any such rights or benefits through litigation, settlement, arbitration, mediation or otherwise, [Interface] shall pay or reimburse [Mr. Gould]'s reasonable legal fees and expenses incurred in enforcing this Agreement.

(Doc. 4-1 at 23, § 11.)

discretion the agreement affords Interface with respect to cause for termination concerns the extent to which Interface must afford Mr. Gould an opportunity to cure "alleged" cause. And that discretion is qualified expressly by a duty to act in good faith.[8] (Doc. 4-1 at 8, § 5(a)(i).)

*Mr. Gould's Tenure as CEO.* When Mr. Gould was appointed CEO, he perceived that the corporate culture at Interface needed to evolve, and he understood that his appointment was intended in part to enable him to be a cultural "change agent." (Doc. 139-1, Gould Dep. 96:3-14.) But unsurprisingly, there was internal resistance to some of his efforts to change the corporate culture. As he explained in his deposition:

> I think a lot of the old guard people didn't like the changes that we were trying to bring in. I was specifically trying to create a culture of accountability, and I think that was a

---

[8] More specifically, this provision of the agreement says:

> A termination of [Mr. Gould] for Cause based on clause (A), (B) or (C) . . . shall take effect 30 days after [Mr. Gould] receives from [Interface] written notice of intent to terminate and [a] description of the alleged Cause, unless [Mr. Gould] shall, during such 30-day period, remedy the events or circumstances constituting Cause; provided, however, such termination shall take effect immediately upon the giving of written notice of termination for Cause under any of such clauses *if [Interface] shall have determined in good faith that such events or circumstances are not remediable* (which determination shall be stated in such notice).

(Doc. 4-1 at 8, § 5(a)(i) (emphasis added).)

LEGAL02/43330961v6

challenge to a lot of people because previously we did not have a culture of accountability. And the good old boy network that existed was certainly pushing back against me as I tried to put these changes in place. And a lot of people didn't like how directly I dealt with them, how directly I communicated with them. . . . [T]here [were] several people in the sales organization that were upset about the changes to the compensation mechanisms that I wanted to use with the sales organization. . . . There were also some old guard, you know, some old time—old, long-tenured people, long-tenured people in the sales organization that rejected our more disciplined approach about running the sales organization [in terms of] [m]ore core processes, more data, better communication, more transparency.

(Doc. 139-1, Gould Dep. 102:1-104:2.)

Important for the purposes of this lawsuit, his attempts to change the culture ultimately brought Mr. Gould into conflict with a number of Interface personnel, including sales associate Alison Millsaps-Morris. It appears, for instance, that Ms. Millsaps-Morris had reservations about Mr. Gould's proposal of a new compensation structure for sales personnel—one in which she stood to lose compensation—and Mr. Gould recalled a tense meeting in which she and another salesperson "accosted" him about their compensation. (Doc. 139-1, Gould Dep. at 99:18-24, 100:16-101:3; Doc. 143-1, Millsaps-Morris Dep. at 73:5-22, 75:2-7.) Mr. Gould also testified that his relationship with several members of the board of directors deteriorated over time, in part due to his efforts to

8

change the corporate culture. (Doc. 139-1, Gould Dep. at 92:15-93:8.) In November 2019, Christopher Kennedy, the lead independent director, started trying to dictate how Mr. Gould should manage the company, threatening to have Mr. Gould fired unless he terminated Interface's director of human resources, among other things. (Doc. 139-1, Gould Dep. at 83:4-85:19.) And in January 2020, Mr. Gould had a lunch with Daniel Hendrix, the chairman of the board and a former CEO, during which Mr. Hendrix made misogynistic comments about female administrative staff, and Mr. Gould pushed back against those comments.[9] (Doc. 139-1, Gould Dep. at 224:10-225:13.)

*The Evening of January 14, 2020.* Interface held an annual meeting of its Americas-region sales personnel at the Terranea Resort in Rancho

---

[9] According to Mr. Gould, when he said that he soon would need to hire a new administrative assistant, Mr. Hendrix said that "the right way to hire a secretary" involved ensuring that she would "fit between desks no more than 24 inches apart" and that a pencil would "stay under her breasts." (Doc. 195 at 8; Doc. 139-1, Gould Dep. at 224:10-225:11.) To these comments, Mr. Gould responded: "That's not how we hire." (Doc. 139-1, Gould Dep. at 225:11-12.) And although Mr. Hendrix testified that he did not endorse such hiring criteria—and he denied having suggested to Mr. Gould that they were, in fact, the "right way to hire a secretary"— he conceded that he had told Mr. Gould and other Interface personnel a story about the founder of Interface reputedly having once used such criteria. (Doc. 140-1, Hendrix Dep. at 238:13-240:10.)

Palos Verdes, California, for four days beginning on January 11, 2020. (Doc. 174-3 ¶ 29.) Mr. Gould attended this company retreat, and his conduct on the evening of January 14—the nature of which is highly disputed, but according to Interface, it involved intoxication and the mistreatment of Interface employees—ostensibly was the basis for the termination of his employment as CEO. Viewed in the light most favorable to Mr. Gould,[10] the evidence shows that the retreat culminated in an awards dinner on the evening of January 14, at which Mr. Gould introduced and gave a toast to Mr. Hendrix.[11] (Doc. 139-1, Gould Dep. at 160:15-161:18.) At some point in the dinner, Mr. Gould teased the Atlanta-based sales team, which was seated at a table adjacent to his, about the Cincinnati-based sales team winning a sales award. (Doc. 139-1, Gould Dep. at 164:2-10.) Before dinner, around 5:00 pm, Mr. Gould had

---

[10] *See generally Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 337 (11th Cir. 2012) ("Because we are reviewing the district court's grant of summary judgment to the defendant, we view the facts and draw all reasonable inferences in a light most favorable to the plaintiffs.").

[11] Much of the retreat was celebratory in nature, featuring an opening reception by a pool on the first night, a costumed awards ceremony on the second night, and small group dinners on the third night. (Doc. 139-1, Gould Dep. at 159:2–24; Doc. 135-1, Adams Dep. at 38:9-42:4). The company provided alcohol at each event. (Doc. 135-1, Adams Dep. at 38:9-42:7; Doc. 143-1, Millsaps-Morris Dep. at 259:5-261:22, 262:10-19.)

one glass of champagne, and he consumed two glasses of wine during the three-hour dinner that began around 7:00 pm.[12]  (Doc. 139-1, Gould Dep. at 162:15-21.) At no point during the dinner, however, did Mr. Gould feel "tipsy." (Doc. 139-1, Gould Dep. at 162:22-24.)

Following the dinner, around 10:00 pm, Mr. Gould called an informal meeting of the regional sales directors—about twenty in all—in a hospitality suite at the hotel. (Doc. 195 at 10; Doc. 139-1, Gould Dep. at 166:7-23; Doc. 135-1, Adams Dep. at 48:3-49:11.) Also present at this meeting were Rhiannon Adams, vice president of the Americas-region sales organization, and Lauren Jones, Mr. Gould's assistant. (Doc. 139-1, Gould Dep. at 167:23-24.) In the course of that meeting, Mr. Gould delivered unprepared remarks to the sales directors, which he later characterized as a "locker room" "pep talk" that was intended to motivate them.[13] (Doc. 139-1, Gould Dep. at 168:4-22.) He admittedly used "some

---

[12] Ms. Adams testified that she recalled the dinner lasted from approximately 7:00 pm to 10:00 pm.  (Doc. 135-1, Adams Dep. at 43:2-44:3.)

[13] A portion of Mr. Gould's remarks was recorded, and that recording confirms his characterization. (Doc. 160, INTERFACE0000007156.) His remarks included, for instance, references to the coaching philosophy of New England Patriots coach Bill Belichick, a reference to "break[ing] huddle," and repeated references to "winning." (Doc. 160, INTERFACE0000007156 at 2:00, 2:12, 2:52, 3:06.)

colorful language" in these remarks (Doc. 139-1, Gould Dep. at 169:12-14, 172:3, 172:13-21), including several usages of "f**k" (Doc. 139-1, Gould Dep. at 172:22-173:3), a reference to Ms. Adams as "a tough b***h"[14] (Doc. 139-1, Gould Dep. at 170:12), a reference to Interface's competitors as "limp d**ks" (Doc. 139-1, Gould Dep. at 173:16-22), and a reference to the desirability of Interface's product portfolio in terms of "wet dreams." (Doc. 139-1, Gould Dep. at 174:23-175:7; Doc. 195 at 10-11.) Ms. Jones thought that his remarks were inappropriate (Doc. 141-1, Jones Dep. at 126:19-128:3), but others did not. (Doc. 160, INTERFACE0000007156 at 3:28.) As Ms. Adams explained, Interface had a "culture where, frankly, a lot of leaders talked like that," and "people using language that is probably not appropriate in many environments" was "accepted widely at Interface."[15] (Doc. 135-1, Adams

---

[14] Mr. Gould intended this reference to be complimentary (Doc. 139-1, Gould Dep. at 170:9-20), and Ms. Adams took it as a compliment. (Doc. 135-1, Adams Dep. at 50:20-51:13, 52:6-13, 113:20-23, 167:6-10; Doc. 135-2, Adams Dep. 222:21-24.)

[15] Indeed, some evidence suggests that profanity and raunchiness were a pervasive part of the Interface corporate culture in January 2020. Aside from Mr. Hendrix's misogynistic comments about "the right way to hire a secretary," *see supra* note 9*,* there is evidence that an Interface vice president used "f**k" more than once in an address to the entire sales meeting (Doc. 140-1, D. Hendrix Dep. at 30:13-31:22; Doc. 138-1,

Dep. at 22:1-3, 170:1-8.) Mr. Gould consumed about a glass-and-a-half of bourbon in the hospitality suite (Doc. 139-1, Gould Dep. at 181:22-182:2), although he testified that he was not intoxicated at the time of the meeting. (Doc. 139-1, Gould Dep. at 168:18-169:2.)

After the meeting in the hospitality suite concluded, Mr. Gould, Ms. Adams, and Ms. Jones walked through the lobby of the hotel. There, at approximately 11:47 pm, they encountered Ms. Millsaps-Morris and Shelby Eanes, both Atlanta-based sales associates. By most accounts, this encounter began as a friendly one, with the participants exchanging greetings, handshakes, and hugs and posing for a smiling photograph. (Doc. 139-1, Gould Dep. at 183:18-183:25, 187:22-188:6; Doc. 135-1, Adams Dep. 57:9-59:23; Doc. 143-1, Millsaps-Morris Dep. at 168:19-170:1; Doc. 136-1, Eanes Dep. at 201:21-25.) But according to Ms. Millsaps-Morris, Mr. Gould appeared to be intoxicated,[16] and at some

---

Interface 30(b)(6) Dep. (Foshee) at 111:13-112:7; Doc. 181 ¶ 27), and in another address to the entire sales meeting, a regional division president opened her coat and shook her breasts at the audience. (Doc. 181 ¶ 31; Doc. 195 at 9-10.)

[16] Ms. Millsaps-Morris said that Mr. Gould was slurring his speech and wobbling (Doc. 143-1, Millsaps-Morris Dep. at 153:5-17), although she testified that she could not say whether he was, in fact, under the influence of alcohol. (Doc. 143-1, Millsaps-Morris Dep. at 154:13-156:8.)

13

point, he drew an unflattering comparison between her and Ms. Eanes, referring to Ms. Eanes as a "ray of sunshine," and repeatedly referring to Ms. Millsaps-Morris as either a "f***ing g*****n b***h" or a "g*****n f***ing b***h."[17] (Doc. 143-1, Millsaps-Morris Dep. at 171:1-21.) Ms. Millsaps-Morris said that Mr. Gould spoke "loudly and firmly and strongly" (Doc. 143-1, Millsaps-Morris Dep. at 206:22-25) and made these references with "anger and intense and direct emotion." (Doc. 143-1, Millsaps-Morris Dep. at 170:11-16.)

Mr. Gould and Ms. Adams recounted the interaction in the lobby very differently.[18] (Doc. 195 at 12 (noting dispute of fact as to the

---

[17] Ms. Eanes mostly corroborated this aspect of Ms. Millsaps-Morris's account. (Doc. 195 at 14-15.) Both said that Mr. Gould teased them about the failure of the Atlanta sales team to win an award at the awards dinner, that Mr. Gould then said that he still loved the Atlanta sales associates notwithstanding their shortcomings, and that Ms. Millsaps-Morris responded tersely that "I don't need constant verbal affirmation." (Doc. 143-1, Millsaps-Morris Dep. at 169:1-170:1; Doc. 136-1, Eanes Dep. at 127:21-128:1, 129:9-13.) Ms. Eanes recalled Mr. Gould then referring to Ms. Millsaps-Morris as either a "b***h" or "f***ing b***h," and that he referred to Ms. Eanes as a "ray of sunshine." (Doc. 136-1, Eanes Dep. at 128:2-6, 129:14-130:4.) Ms. Eanes, however, disagreed with Ms. Millsaps-Morris about the timing and sequence of events, testifying that Mr. Gould first referred to Ms. Millsaps-Morris as a "b***h" or "f***ing b***h" early in their encounter and before any photograph was taken. (Doc. 136-1, Eanes Dep. at 127:20-128:3, 129:6-20, 130:10-131:5.)

[18] Ms. Jones recalled at the time of her deposition only that Mr. Gould at some point uttered the phrase "f***ing b***h," although she could not

"contents of the conversation").) Ms. Adams testified that Mr. Gould's exchange with Ms. Millsaps-Morris and Ms. Eanes was "friendly" and that everyone was "smiling and seemed very happy." (Doc. 135-1, Adams Dep. at 58:7-17.) She said that she was standing no more than six feet away from Mr. Gould and Ms. Millsaps-Morris during this encounter, but she never heard Mr. Gould say anything inappropriate. (Doc. 135-1, Adams Dep. at 58:24-60:24.) For his part, Mr. Gould described the encounter as one in which they were "joking around" about the failure of the Atlanta-based sales team to win an award. (Doc. 139-1, Gould Dep. at 183:18-25.) Mr. Gould unequivocally denied that he ever referred to Ms. Millsaps-Morris as a "f***ing b***h" or to Ms. Eanes as a "ray of sunshine." (Doc. 139-1, Gould Dep. at 184:13-17.) And although Mr. Gould admitted that he had consumed between four and five alcoholic drinks over the course of the entire evening,[19] he unequivocally denied

---

say to whom it was directed or how often it was said. (Doc. 141-1, Jones Dep. at 117:20-118:23.)

[19] As noted earlier, Mr. Gould admitted that he drank: one glass of champagne before the dinner, around 5:00 pm; two glasses of wine at the dinner, which began around 7:00 pm and lasted about three hours; and one-and-a-half glasses of bourbon during the meeting in the hospitality suite, which started around 10:00 pm and lasted for more than an hour. (Doc. 139-1, Gould Dep. at 162:15-21, 181:22-182:2.) He was still holding the second glass of bourbon—which was not empty—when he walked into

that he was intoxicated at any time during the retreat. (Doc. 139-1, Gould Dep. at 107:13-106:6, 168:18-169:2.)

The resort's security surveillance system made a video recording of the encounter in the lobby. Although the recording does not include audio, it depicts an encounter that is consistent with Ms. Adams and Mr. Gould's accounts. The encounter lasts for approximately six minutes and appears to be a friendly one throughout. To begin, Mr. Gould, Ms. Adams, and Ms. Jones are seen to exchange greetings and hugs with Ms. Millsaps-Morris and Ms. Eanes. (Doc. 160, Terranea_Media_000006, 0-2020-01-14 23-44-00-223.mov[20] at 23:47:25.) At no point in the recordings does Mr. Gould appear to be unsteady on his feet or angry. To the contrary, he can be seen hugging Ms. Millsaps-Morris on five occasions. (Doc. 160, Terranea_Media_000006 at 23:47:30, 23:48:42, 23:51:00, 23:52:27, 23:52:55.) About two minutes into the encounter, Mr. Gould takes a photograph with Ms. Millsaps-Morris and Ms. Eanes, and the three pose with arms around one another and without any apparent hostility or hesitation. (Doc. 160, Terranea_Media_000006 at 23:49:44-

---

the hotel lobby around 11:47 pm. (Doc. 139-1, Gould Dep. at 182:7-10, 184:9-12, 187:22-188:12; Doc. 160, Terranea_Media_000006 at 23:47:00.)

[20] Hereinafter "Terranea_Media_000006."

16

50:04.) After the photograph—and about three minutes into the encounter—Ms. Millsaps-Morris leans in toward Mr. Gould and the two appear to laugh together. (Doc. 160, Terranea_Media_000006 at 23:50:11-30.) About a minute later, Ms. Eanes is seen to throw her head back in laughter, apparently in response to something Mr. Gould said. (Doc. 160, Terranea_Media_000006 at 23:51:28.) And at the conclusion of the encounter, as Ms. Millsaps-Morris and Ms. Eanes depart the lobby for their rooms, Ms. Millsaps-Morris is seen blowing a kiss toward Mr. Gould. (Doc. 160, Terranea_Media_000006 at 23:52:40.)

*The Termination of Mr. Gould's Employment.* The next morning, Ms. Millsaps-Morris filed a complaint with Interface's human resources department, claiming that Mr. Gould referred to her in profane terms when they met briefly in the hotel lobby. (Doc. 173-4 ¶ 49.) That same day, Mr. Hendrix notified Mr. Kennedy of an alleged incident involving Mr. Gould and Ms. Millsaps-Morris.[21] (Doc. 181 ¶¶ 47-48.) Mr. Kennedy then hired a Chicago lawyer to investigate the incident and make a report to the independent directors. (Doc. 137-1, Fardon Dep. at 164:20-165:8,

---

[21] There is a dispute of fact as to whether Mr. Hendrix reported the "incident" before or after Ms. Millsaps-Morris filed her complaint with the human resources department. (Doc. 181 ¶ 48.)

LEGAL02/43330961v6

278:13-25.) Mr. Kennedy made clear that he wanted a report from the lawyer within three days. (Doc. 145-1, Palmer Dep. at 84:23-85:5; Doc. 137-1, Fardon Dep. at 267:5-24, 275:14-276:1.) On Friday, January 17— just three days after the lobby encounter—the lawyer made a report to Interface's independent directors and Mr. Hendrix. (Doc. 137-1, Fardon Dep. at 268:1-6.)

Two days later, the lawyer made another report to the full board of directors. (Doc. 137-1, Fardon Dep. at 118:2-119:17.) At that time, however, the lawyer's investigation was not yet complete. The lawyer had interviewed only 12 witnesses, though he eventually would interview 40 witnesses in all. (Doc. 137-1, Fardon Dep. at 118:22-121:4.) The lawyer had interviewed Mr. Gould, but only for 20 minutes and without asking or mentioning anything about Ms. Millsaps-Morris. (Doc. 139-1, Gould Dep. at 198:1-7, 207:24-208:15.) Moreover, the lawyer had not yet obtained or reviewed the video recording of the encounter in the hotel lobby. (Doc. 137-1, Fardon Dep. at 268:15-20; Doc. 142-1, Kennedy Dep. at 269:1-11.) Nonetheless, after the lawyer gave this report, the board

decided to terminate Mr. Gould's employment, effective immediately and purportedly for cause.[22] (Doc. 145-1, Palmer Dep. at 103:15-104:5.)

The same day as the vote to terminate Mr. Gould's employment, the board sent a written notice of termination to Mr. Gould, which reads in pertinent part:

> This letter is to inform you that at a duly noticed and convened meeting of the Board of Directors of Interface, Inc. ("Interface" or the "Company") held on January 19, 2020, the Directors unanimously adopted a resolution that your employment as Chief Executive Officer and President of the Company be terminated for Cause pursuant to Sections 5(a)(i)(A) and (B) of your March 3, 2017 Amended and Restated Employment and Change in Control Agreement (the "Employment Agreement"). Your employment is being terminated for Cause based on your repeated abuse of alcohol at Company sponsored events and willful mistreatment of subordinate employees, both in violation of Interface's established lawful policies. The most recent incidents of this behavior occurred during Interface's January 14, 2020 Sales Meeting in Los Angeles, California; however, the Company

---

[22] It would take the lawyer several weeks after Mr. Gould's termination to conclude the investigation, and he sent his final reports as late as March 10, 2020. (Doc. 137-1, Fardon Dep. at 275:21-276:10; Doc. 134-5; Doc. 134-6; Doc. 134-7.) One board member who participated in both the January 17 and 19 meetings testified that, when she voted to terminate Mr. Gould's employment, she was unaware that the lawyer's investigation was incomplete. (Doc. 145-1, Palmer Dep. at 88:13-19, 95:22-97:13.) When she was shown the video recording of the encounter in the hotel lobby for the first time in her deposition, this board member said that she "didn't see anything in the video that would suggest abusive [behavior]." (Doc. 145-1, Palmer Dep. at 92:2-16.)

LEGAL02/43330961v6

has counseled you regarding similar behavior in the past. Given your repeated engagement in this inappropriate and willful misconduct, as well as the irreparable damage it has caused, the Company has determined in good faith that the circumstances giving rise to your termination for Cause are not remediable. Accordingly, your employment is being terminated for Cause effective immediately.

(Doc. 134-15 at 2.) The specific provisions of the employment agreement referenced in the letter are those that define "cause" to include "fraud, dishonesty, gross negligence, or *willful misconduct with respect to business affairs* of [Interface]" (Doc. 4-1 at 8, § 5(a)(i)(A) (emphasis added)), and "*refusal* or repeated failure *to follow the established lawful policies* of [Interface] applicable to persons occupying the same or similar positions." (Doc. 4-1 at 8, § 5(a)(i)(B) (emphasis added).)

To establish the existence of a "policy" concerning "abuse of alcohol" or "willful mistreatment of subordinate employees," Interface has pointed in this litigation to two documents. The first is a policy manual for the Americas division of Interface (Doc. 134-1 at 3; Doc. 134-2 ¶ 17), although there is a factual dispute about whether this manual ever applied to Mr. Gould and other personnel in the corporate office of the whole corporation. (Doc. 174-3 ¶¶ 16-17.) The second is a February 2019 memorandum from Mr. Hendrix to Mr. Gould, in which Mr. Hendrix on

behalf of the board of directors says that "bullying" and "abuse of alcohol at Company-sponsored events" will not be tolerated. (Doc. 134-1 at 31-32; Doc. 134-4 at 2-3.) Notably, this memorandum—which appears to be the subject of the reference in the termination letter to Mr. Gould previously having been "counseled" about alleged "bullying" and "abuse of alcohol"—defines neither term. (Doc. 134-4 at 2-3.) Whatever "abuse of alcohol" means as that phrase is used in the memorandum, other evidence suggests that it cannot reasonably be understood in the context of Interface's corporate culture to mean merely the consumption of alcohol.[23]

---

[23] The evidence suggests that alcohol consumption was pervasive—and for that matter, intoxication too—at the January 2020 company retreat. Throughout the week, Interface provided alcoholic drinks for the evening events. (Doc. 169-1, J. Hendrix Dep. at 32:1-11, 32:20-22, 34:19-25; Doc. 135-1, Adams Dep. at 41:3-9, 42:3-7, 44:4-24.) Ms. Adams testified that "a lot of folks get drunk" "at every sales meeting," sometimes including high-ranking executives. (Doc. 135-1, Adams Dep. at 30:2-4, 32:11-33:17.) Putting Mr. Gould aside, other Interface officers and managers were observed to be intoxicated at the January 2020 retreat, including on the evening of January 14. (Doc. 135-1, Adams Dep. at 32:11-15, 52:17-21, 53:15-22.)

LEGAL02/43330961v6

### *Course of Proceedings and Disposition in the District Court*

Mr. Gould brought this lawsuit against Interface in February 2020. In his amended complaint,[24] Mr. Gould asserted a claim for breach of his employment agreement (Doc. 4 at 20-21, ¶¶78-83), alleging specifically that Interface breached the agreement by failing to pay him amounts to which he was entitled upon the termination of his employment. (Doc. 4 at 21, ¶81.) Mr. Gould also alleged that, contrary to the claims in his written notice of termination, he "was not intoxicated and did not mistreat subordinate[] employees" on the evening of January 14, 2020, and Interface had no cause to terminate his employment. (Doc. 4 at 15, ¶53.) Based on these allegations, Mr. Gould sought to recover damages in the amounts to which he was contractually entitled in the event of termination without cause, as well as attorneys' fees and litigation expenses.[25] (Doc. 4 at 21, ¶83.) In addition to breach of the employment agreement, Mr. Gould also asserted a claim under federal law for

---

[24] Mr. Gould filed his amended complaint in March 2020, and the amended complaint is the pleading that frames the issues resolved by the summary judgment from which Mr. Gould appeals.

[25] Mr. Gould sought to recover attorneys' fees and litigation fees under O.C.G.A. § 13-6-11, as well as under the terms of his employment agreement. *See supra* note 7.

LEGAL02/43330961v6

unlawful employment practices and claims under state law for defamation and breach of a duty to act in good faith. (Doc. 4 at 19-26.)

Interface answered and asserted a counterclaim for breach of fiduciary duty. (Doc. 7 at 48-49.) Interface also filed a motion for judgment on the pleadings as to Mr. Gould's claim for breach of a duty to act in good faith (Doc. 15), which the district court granted in February 2021. (Doc. 92.) Three months later, Mr. Gould voluntarily dismissed his defamation claims by stipulation. (Doc. 127.)

In July 2021, Interface filed a motion for summary judgment on Mr. Gould's remaining claims. (Doc. 134.) With respect to the claim for breach of the employment agreement, Interface argued that the agreement vests the board of directors with an absolute and unreviewable discretion not only to terminate Mr. Gould's employment, but also to determine conclusively whether there is cause for the termination. (Doc. 134-1 at 23-25.) Because the board had exercised that absolute and unreviewable discretion and determined that there was cause to terminate Mr. Gould's employment, Interface reasoned, that determination was conclusive and the end of the matter. (*See* Doc. 134-1 at 26.) Interface argued in the alternative that, even if the board's discretion were qualified by a duty to

act in good faith, it indisputably had a good-faith basis for believing that there was cause to terminate Mr. Gould's employment. (Doc. 134-1 at 28-32.) Mr. Gould responded that cause for termination was governed by the contractual definition of cause in the agreement, that the board was not vested with authority to redefine cause, and that he was, in fact, terminated without cause.[26] (Doc. 174-1 at 30-31.)

The motion for summary judgment was referred to a magistrate judge, who recommended that it be granted.[27] (Doc. 195 at 46-57.) With respect to the claim for breach of the employment agreement, the magistrate judge accepted that the agreement vests the board with an

---

[26] Consistent with the arguments in the briefing, Mr. Gould argued at a hearing on the motion for summary judgment that it was for a jury to decide "whether he was properly terminated for cause and whether he should have been terminated without cause." (Doc. 220, MSJ Hearing Tr. at 73-74.)

[27] Most of the magistrate judge's report and recommendation concerns the claim under federal law for unlawful employment practices, about which Mr. Gould asserts no claim of error in this appeal. Only 11 pages of the 58-page report concern the breach claim. (Doc. 195 at 46-57.) Because the magistrate judge recommended summary judgment for Interface on all of Mr. Gould's substantive, claims, it found no basis for his claim for attorneys' fees, and recommended summary judgment on that derivative claim as well. (Doc. 195 at 57 n.15.)

24

absolute and unreviewable discretion to determine conclusively whether

there is cause to terminate Mr. Gould's employment:

> Here, the provision governing termination provided that,
> subject to the terms of the provision governing termination
> *without* cause, "[Interface] may terminate [Mr. Gould]'s
> employment hereunder, in its sole discretion, whether with or
> without Cause, at any time upon written notice to [Mr.
> Gould]." Thus, in terminating an employee for cause,
> [Interface] was expressly given sole discretion. [Interface]
> determined that [Mr. Gould] fell under the definition of "for
> cause" and was expressly given the right, in its sole discretion,
> to terminate [Mr. Gould] on that ground.

(Doc. 195 at 53 (internal citations omitted).) Mr. Gould filed exceptions

to this report, arguing in pertinent part that the magistrate judge

misconstrued the employment agreement in a way that effectively

rendered the contractual definition of cause superfluous. (Doc. 198 at 32.)

The district court summarily rejected the exceptions with respect to the

claim for breach and adopted the magistrate judge's recommendation.[28]

(Doc. 201 at 21.)

---

[28] The district court wrote extensively about the federal claim for
unlawful employment practices—rejecting or modifying several of the
magistrate judge's recommendations on that claim (Doc. 201 at 2-21)—
but adopted the entirety of the magistrate judge's recommendations on
breach of the employment agreement without additional analysis. (Doc.
201 at 21.)

LEGAL02/43330961v6

The district court entered an order awarding summary judgment to Interface, and it directed the entry of a "partial final judgment in favor of [Interface] as to all of [Mr. Gould]'s claims." (Doc. 209.)[29] Mr. Gould appealed (Doc. 214), but this Court dismissed the appeal as premature, holding that the district court abused its discretion in certifying the summary judgment as final and that this Court, therefore, lacked appellate jurisdiction. (Doc. 222.) After the case returned to the district court, and in the light of this Court's determination that the summary judgment was not final, Mr. Gould filed a motion to reconsider the award of summary judgment on his breach of contract claim. (Doc. 223.) After the district court scheduled a hearing on the motion for reconsideration (Doc. 246), Interface filed a notice of its intent to dismiss its counterclaim in the event that the district court denied the motion to reconsider. (Doc.

---

[29] The district court awarded summary judgment to Interface on March 31, 2022, but in the same order, it mistakenly directed the clerk to enter final judgment and close the case. (Doc. 201 at 22.) Because Interface's counterclaim remained pending, the parties timely filed a joint motion to modify the judgment. (Doc. 203.) On May 12, 2022, the district court granted that motion, set aside the judgment previously entered, and directed the entry of a partial final judgment. (Doc. 205 at 1.) To correct an omission in the May 12 order, the district court subsequently entered a modified, partial final judgment on June 13, 2022. (Doc. 209.)

247.) Following the hearing, the district court denied the motion for reconsideration (Doc. 252), and Interface then filed a motion to dismiss its counterclaim. (Doc. 253.) The district court granted that motion on August 2, 2023, and entered the final judgment from which Mr. Gould now appeals. (Doc. 256.)

## Standard of Review

This Court reviews an award of summary judgment *de novo*. *See Auriga Polymers Inc. v. PMCM2, LLC,* 40 F.4th 1273, 1281 (11th Cir. 2022). Summary judgment is appropriate "where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. In assessing whether there are genuine disputes as to any material facts, this Court views the evidence in the light most favorable to the nonmoving party. *See Huggins v. Lueder, Larkin & Hunter,* 39 F.4th 1342, 1345 (11th Cir. 2022). And to the extent that summary judgment implicates a question about the meaning of a contract, the Court also reviews the interpretation of the contract *de novo. See Southern-Owners Ins. Co. v. Easdon Rhodes & Assocs.,* 872 F.3d 1161, 1164 (11th Cir. 2017).

LEGAL02/43330961v6

## SUMMARY OF THE ARGUMENT

The district court erred when it awarded summary judgment to Interface on Mr. Gould's claim for breach of his employment agreement. Interface terminated Mr. Gould's employment, ostensibly for good cause, based on his conduct at a January 2020 company retreat. In the notice of termination, Interface alleged that Mr. Gould abused alcohol and mistreated subordinate employees at the retreat, which violated its policies and amounted to willful misconduct under his employment agreement. But the evidence that Mr. Gould actually did the things of which he was accused is disputed in this case.

In awarding summary judgment to Interface, the district court avoided these conflicts in the evidence by construing Mr. Gould's employment agreement to give absolute and unreviewable discretion to Interface to determine conclusively whether there was good cause to terminate his employment. That understanding of the agreement, however, reflects a misapplication of fundamental principles of contract interpretation under Georgia law. The plain terms of the contractual provision on which the district court relied cannot be reasonably understood to confer unbounded discretion on Interface to determine the

existence of cause, and such an understanding is inconsistent with other provisions of the agreement, as well as the contract as a whole. Properly understood, it is for a court—not Interface—to decide whether Interface had good cause for terminating Mr. Gould's employment.

And because the evidence presents genuine disputes of material fact about the existence of cause, the claim for breach of the employment agreement cannot be resolved on summary judgment. It is undisputed that Mr. Gould drank alcohol at the retreat, but whether he was intoxicated—and whether he was intoxicated to an extent that would amount to "abuse of alcohol" in the context of the retreat—are disputed. It is undisputed that Mr. Gould used colorful language in addressing a meeting of regional sales directors, but whether his colorful language was inappropriate in that particular context—and whether it was so inappropriate as to amount to good cause for termination under the employment agreement—is disputed. And whether Mr. Gould referred to a particular Interface employee as a "b***h" at the retreat involves a classic "he said, she said" dispute that is uniquely unsuited for summary adjudication.

LEGAL02/43330961v6

Interface either had cause to terminate Mr. Gould's employment, or it didn't, and the company doesn't get to decide conclusively that it had cause. The existence of cause instead must be decided in this case by a jury. The Court should reverse the award of summary judgment on the claim for breach of the employment agreement, as well as the derivative claim for attorneys' fees.

## ARGUMENT AND CITATION OF AUTHORITY

### *Mr. Gould's employment agreement does not vest Interface with unreviewable discretion to determine conclusively whether there is cause to terminate his employment*

Properly understood, the employment agreement does not confer an absolute and unreviewable discretion upon Interface to determine conclusively whether there is cause to terminate Mr. Gould's employment. When a court considers the meaning of a contract made pursuant to Georgia law,[30] it undertakes to ascertain the intent of the parties. *See Langley v. MP Spring Lake,* 307 Ga. 321, 324, 834 S.E.2d 800, 804 (2019). "When the terms of a contract are clear and unambiguous, the reviewing court looks only to the contract itself to

---

[30] Mr. Gould's employment agreement is governed by Georgia law. (Doc. 4-1 at 23, § 10.)

determine the parties' intent." *Unified Gov't of Athens-Clarke Cnty v. Stiles Apts.,* 295 Ga. 829, 832, 764 S.E.2d 403, 407 (2014). In examining the terms of a contract, courts "generally accept that contractual terms carry their ordinary meanings." *Archer W. Contractors v. Estate of Pitts,* 292 Ga. 219, 224, 735 S.E.2d 772, 777 (2012). Importantly, however, a court does not review contractual terms in isolation. To the contrary, a court must look to the whole agreement and endeavor to construe each of the contractual terms "in a manner that permits all of the terms contained therein to be consistent with one another." *Schwartz v. Schwartz,* 275 Ga. 107, 108, 561 S.E.2d 96, 97 (2002). *See also Archer W. Contractors,* 292 Ga. at 224, 735 S.E.2d at 777 ("Contracts must be construed as a whole, and the whole contract should be looked to in arriving at the construction of any part.") (cleaned up). In particular, a contract generally "should not be construed in a manner that renders any portion of it meaningless." *Floyd v. Floyd,* 291 Ga. 605, 610 n.8, 732 S.E.2d 258, 264 (2012). Viewing the contract as a whole, a court must give each provision "a reasonable construction." *Ga. Power & Light Co. v. Waycross,* 181 Ga. 216, 220, 181 S.E. 575, 577 (1935). *See also S. Telecom Inc. v. TW Telecom of Ga.,* 321 Ga. App. 110, 115, 741 S.E.2d 234, 238

(2013). With these principles in mind, we turn now to the proper understanding of the employment agreement, and more specifically, Section 5(c).

*Section 5(c).* Even standing alone, Section 5(c) of the employment agreement does not unambiguously confer an absolute and unreviewable discretion to determine conclusively whether there is cause to terminate Mr. Gould's employment. Section 5(c) provides:

> Subject to the terms of Section 5(d) below, [Interface] may terminate [Mr. Gould]'s employment hereunder, in its sole discretion, whether with or without Cause, at any time upon written notice to [Mr. Gould].

(Doc. 4-1 at 10, § 5(c).) Read most reasonably and naturally, this single-sentence provision consists of an introductory prepositional phrase ("Subject to the terms of Section 5(d) below"), followed by the main clause ("[Interface] may terminate [Mr. Gould]'s employment hereunder . . . at any time upon written notice to Mr. Gould"), which itself is broken in the middle by two separate and distinct nonrestrictive phrases, each set off by commas that precede and follow the phrase ("in its sole discretion" and "whether with or without Cause"). *See generally* Bryan A. Garner, A Dictionary of Modern American Usage (1998) at 538. In ordinary American English, a reader would understand each of these separately

bounded phrases to independently modify the main clause, but neither bounded phrase modifies the other. In other words, Section 5(c) most reasonably is understood to mean simply that Interface has the authority to terminate Mr. Gould's employment at any time upon written notice and that this *power to terminate* is subject to Section 5(d), is committed to the sole discretion of Interface, and exists irrespective of whether Interface has cause to terminate.

But the question presented here is not whether Interface had the authority to terminate Mr. Gould's employment. Indeed, Mr. Gould does not contend that Interface breached his agreement simply by firing him. Rather, the pertinent issue is whether Interface—at the time it exercised its undisputed authority to terminate his employment at any time—had cause under the agreement. And read reasonably, nothing in Section 5(c) suggests that Interface has the discretion to decide for itself—whether conclusively or qualified by a duty of good faith—whether cause exists.[31]

---

[31] Mr. Gould submits that this is *the only* reasonable interpretation of Section 5(c). But it certainly is *a* reasonable interpretation. Indeed, although the district court denied Mr. Gould's motion for reconsideration of the summary judgment, it acknowledged in its order that "[Mr.] Gould's interpretation is certainly a reasonable one." (Doc. 252 at 8.) And even to the extent that Interface's interpretation also was reasonable—it isn't when Section 5(c) is considered in isolation, and it most certainly

In construing Section 5(c) otherwise, the magistrate judge relied on *Automatic Sprinkler Corp. of America v. Anderson,* 243 Ga. 867, 257 S.E.2d 283 (1979), but that reliance was misplaced. (Doc. 195 at 53.) In *Automatic Sprinkler,* a former employee sued his former employer for certain incentive compensation that he claimed he was owed under the terms of a corporate compensation plan. But the plan said unequivocally that such compensation "is entirely within the discretion of the corporation." 243 Ga. at 869, 257 S.E.2d at 285. The Supreme Court explained that, when a contract affirmatively vests a contracting party with discretion to determine something, "the question is not whether [its determination] was in fact erroneous, but whether it was in bad faith, arbitrary or capricious." *Id.* at 868, 257 S.E.2d at 284 (citation omitted). The court then said, however, that "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." *Id.* Because of the language used in the contract at issue—placing an award

---

isn't when Section 5(c) is considered in the context of the whole employment agreement—that would merely present an ambiguity, which would be resolved against Interface as the party that drafted the agreement. *See Langley*, 307 Ga. at 324, 834 S.E.2d at 804.

of compensation "entirely within the discretion of the corporation"—the court held that the contract did not merely confer discretion on the former employer to deny an award, but it conferred an absolute and unreviewable discretion. *See id*. at 869, 257 S.E.2d at 285.

Here, *Automatic Sprinkler* undoubtedly would support a conclusion that the discretion conferred upon Interface to terminate Mr. Gould's employment is absolute, if that were the issue. But it isn't. The issue is whether Interface had absolute discretion to determine that it had cause to terminate Mr. Gould's employment. Insofar as the employment agreement indisputably gives Interface the prerogative to fire Mr. Gould even *without* any cause, there is no reason to think that its discretion to terminate must inherently include a discretion to determine the existence of cause. By its plain terms, Section 5(c) only vests Interface with discretion to terminate employment, and nothing in *Automatic Sprinkler* supports a reading of Section 5(c) that folds an authority to determine cause into that discretion. Because Interface has no discretion under the agreement to determine the existence of cause, this case is one in which the issue, to put it as the Supreme Court did in *Automatic*

*Sprinkler,* is whether Interface's determination of cause "was in fact erroneous." 243 Ga. at 868, 257 S.E.2d at 284.

*Other Provisions of the Employment Agreement.* A consideration of the whole agreement only confirms that Section 5(c) cannot reasonably be understood to confer an unreviewable discretion upon Interface to determine conclusively whether there is cause to terminate Mr. Gould's employment. To begin, Section 5(c) is expressly "[s]ubject to the terms of Section 5(d)," and Section 5(d) contains no reference to a *determination* or *finding* of cause by Interface. Rather, Section 5(d) says:

> If, prior to the end of the Term of this Agreement, [Interface] terminates [Mr. Gould]'s employment with [Interface] without Cause such that [Mr. Gould] incurs a Section 409A Separation from Service upon the date of such termination, [Mr. Gould] shall be entitled to receive the compensation and benefits set forth in clauses (i) through (vi) below.

(Doc. 4-1 at 10, § 5(d).) It is unequivocal: If Interface fires Mr. Gould "without Cause," then Mr. Gould "shall be entitled to receive the compensation and benefits" described in Section 5(d). *Id.* Payment of compensation and benefits is the performance required by Section 5(d), and a termination in the absence of cause is a classic condition precedent to the obligation to perform. *See Va. Props., Inc. v. Rose,* 210 Ga. App.

878, 880, 437 S.E.2d 835, 836 (1993). This is the provision that Interface breached, and it says nothing about Interface having any discretion.

The condition precedent in Section 5(d) explicitly refers back to the contractual definition of "Cause" in Section 5(a)(i), and Section 5(a)(i) likewise does not contain any provision that even arguably gives Interface discretion to conclusively determine the existence of cause. Indeed, three distinct aspects of Section 5(a)(i) cut squarely against the idea that Interface has such discretion under the employment agreement.

*First,* Section 5(a)(i) defines cause both in objective terms and comprehensively. (Doc. 4-1 at 8, § 5(a)(i).) That this provision defines cause in objective terms suggests that it was intended to provide meaningful predictability to the parties, and also that it was written to enable a disinterested neutral to assess whether cause exists. *Cf. Jackson v. JHD Dental, LLC*, No. 1:10-CV-00173-JEC, 2011 U.S. Dist. LEXIS 63015, at *21-22, *24 (N.D. Ga. June 14, 2011) (where "cause" was defined in employment agreement by reference to "objective benchmarks," the disputed existence of cause was for a jury to decide). And that it defines cause so comprehensively likewise suggests that Interface does not have discretion to determine conclusively whether

cause exists. If it had such unreviewable discretion, Interface could just decide that rooting for a particular Southeastern Conference football team—or any other equally arbitrary criterion—amounts to cause, and it then *would be* cause. Such a construction would render the definitional provision of Section 5(a)(i) altogether meaningless. Why would parties go to the trouble of writing a such comprehensive provision that effectively amounts to nothing but surplusage?

*Second,* Section 5(a)(i) provides that, if Interface seeks to terminate Mr. Gould's employment for cause, it must give notice of termination that includes a "description of the *alleged* Cause." (Doc. 4-1 at 8, § 5(a)(i) (emphasis added).) By characterizing the basis for a termination as merely "alleged" cause, this provision belies the notion that Interface enjoys unfettered discretion to determine whether cause exists. If Interface did enjoy such discretion, it would never "allege" cause, but rather conclusively find cause. Interface's own interpretation of the employment agreement—as one that gives it absolute and unreviewable discretion to determine whether cause exists—renders this provision about "alleged" cause nonsensical.

LEGAL02/43330961v6

*Third,* Section 5(a)(i) explicitly confers a particular discretion upon Interface—albeit one that is qualified expressly by a duty to act in good faith—with respect to assessing whether cause is remediable. In general, if Interface seeks to terminate for cause, it must give Mr. Gould 30 days to cure or remedy the cause. But it need not afford an opportunity to cure if it "shall have determined in good faith that such events or circumstances are not remediable." (Doc. 4-1 at 8, § 5(a)(i).) This provision illustrates that Interface knew how to draft a provision that confers discretion when the parties actually intended such a provision. Moreover, it would make little sense to require Interface to exercise good faith in determining whether cause was remediable if it were permitted to define cause to mean whatever it wanted, even in bad faith.

In addition to these features of Section 5(a)(i), the agreement as a whole suggests strongly that the existence of cause is not simply for Interface to determine. About half of the contract concerns the rights and obligations of the respective parties in the event that Mr. Gould's employment is terminated. Not only is the contractual definition of cause comprehensive, but so is the contractual specification of the compensation and benefits to which Mr. Gould is entitled if his

employment is terminated without cause. (Doc. 4-1 at 10-13, § 5(d).) Moreover, the agreement clearly presupposes that Mr. Gould might go to court to enforce his rights under the contract, and that he might do so with some chance of success. (Doc. 4-1 at 23, § 11 (legal fees and expenses incurred in successfully enforcing rights "through litigation").) But if his contractual rights with respect to termination really depend entirely on Interface's whim—which really is the upshot of its interpretation of the agreement—what's the point?

*The Existence of Contractual Cause is an Issue Fit for a Jury to Decide when the Evidence is Disputed.* There is nothing remarkable about a contractual interpretation that permits a jury to second-guess an employer's determination that cause exists to fire an employee. In *Jackson,* for instance, the district court held that an employment contract defining cause in terms of "objective benchmarks"[32] presented "issues of

---

[32] In *Jackson,* these "objective benchmarks" included:

> (1) [P]laintiff's "willful . . . neglect to perform the duties and responsibilities" of his position, (2) conduct by plaintiff that was "detrimental to the reputation, character, business or standing" of [the employer], (3) plaintiff's "failure to perform assigned job responsibilities" in a manner that would be expected from a person of "average competence" working with "average diligence," and (4) the failure of [the employer] to

fact for the jury except in the clearest cases." 2011 U.S. Dist. LEXIS 63015 at *24. Juries in Georgia routinely are charged with deciding whether cause existed to terminate employment under an employment agreement. *See, e.g., Savannah Coll. of Art & Design v. Nulph,* 265 Ga. 662, 662-63, 460 S.E.2d 792, 793-94 (1995); *Cobb Beauty Coll. v. Scamihorn,* 339 Ga. App. 751, 756, 792 S.E.2d 769, 773 (2016); *Chen v. Tai,* 232 Ga. App. 595, 596-97, 502 S.E.2d 531, 533 (1998); *Waldrop v. Cmty. Health Sys.,* No. 4:16-CV-0235-HLM, 2017 U.S. Dist. LEXIS 231579, at *56 (N.D. Ga. Aug. 28, 2017). Courts in other jurisdictions similarly have recognized that "the issue of whether there is just cause for termination is not easily susceptible to summary judgment." *Tacket v. Delco Remy,* 959 F.2d 650, 653-54 (7th Cir. 1992) (under Indiana contract law). *See also Higgins v. Smith Int'l, Inc.,* 716 F.2d 278, 284 (5th Cir. 1983); *Kern v. Palmer Coll. of Chiropractic,* 757 N.W.2d 651, 659 (Iowa 2008); *Lawrence v. Cue Paging Corp.,* 194 W. Va. 638, 642, 461

---

meet "reasonable targeted financial goals as determined in the reasonable discretion of the [m]anagers."

2011 U.S. Dist. LEXIS 63015 at *5-6. The benchmarks in Section 5(a)(i) of Mr. Gould's employment agreement are equally objective.

S.E.2d 144, 148 (1995); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 619-20, 292 N.W.2d 880, 895 (1980).

### *The district court erred when it found no genuine disputes of material fact as to the existence of cause, and it erred in awarding summary judgment to Interface*

When the employment agreement is properly understood, cause either exists or doesn't, and Interface does not have the authority to decide for itself—unreviewably and conclusively—that cause exists. Upon Mr. Gould's lawsuit for breach of his employment agreement, it is for a court to consider evidence of his alleged conduct, determine what he actually did, hold his conduct up against the contractual definition of cause, and then decide whether Interface actually had good cause to terminate his employment. And where there are genuine disputes of material fact about the nature of his conduct, they must be resolved by a jury.

Here, the undisputed evidence shows that the alleged cause for the termination of Mr. Gould's employment was his "abuse of alcohol" and "willful mistreatment of subordinate employees" (Doc. 134-15 at 2), allegedly in violation of a policy established by a February 2019 memorandum directing Mr. Gould that "abuse of alcohol" and "bullying"

would not be tolerated, terms that are undefined in the memorandum. (Doc. 134-4 at 2, 3.) Interface asserted in the notice of termination that Mr. Gould had done these things at the January 2020 company retreat in Rancho Palos Verdes, California. (Doc. 134-15 at 2.) And in the course of this litigation, Interface has pointed specifically to Mr. Gould's conduct on the evening of January 14, 2020—his consumption of alcohol, his remarks and conduct at the meeting of regional sales directors, and his encounter with Ms. Millsaps-Morris in the hotel lobby—as evidence of cause. But the evidence about what Mr. Gould actually did on the evening of January 14 is hotly disputed.

About his consumption of alcohol, Mr. Gould has conceded that he consumed fewer than *five* drinks—one glass of champagne, two glasses of wine, and about a glass-and-a-half of bourbon—over a period of six-to-seven hours that evening. (Doc. 139-1, Gould Dep. at 162:15-21, 181:22-182:2.) He has testified unequivocally, however, that he was not "intoxicated" as a result of these drinks (Doc. 139-1, Gould Dep. at 107:13-106:6, 168:18-169:2), and a video recording that depicts Mr. Gould for a six-minute period near the end of the evening does not show him to be unsteady on his feet or otherwise obviously drunk. (Doc. 160,

Terranea_Media_000006.) Although Interface has presented some evidence that Mr. Gould was intoxicated—the testimony of witnesses, some of whom themselves were drinking alcohol on that evening (Doc. 136-1, Eanes Dep. at 33:11-34:24)—the evidence of intoxication is disputed and rife with questions about the credibility of various witnesses. No serious person would contend that *any* consumption of alcohol is "abuse of alcohol," much less anyone acquainted with the alcohol-fueled atmosphere typical of Interface company retreats. *See supra* notes 11 and 23. *See also*, (Doc. 135-1, Adams Dep. at 30:2-14.) Whether Mr. Gould was intoxicated at all—and whether he was intoxicated to an extent that would constitute "abuse of alcohol" for purposes of the applicable Interface policy, *cf. State v. Gray,* 267 Ga. App. 753, 756, 600 S.E.2d 626, 629 (2004) (noting that intoxication is a relative concept, measurable in degrees), *disapproved in part on other grounds in Hughes v. State,* 296 Ga. 744, 752, 770 S.E.2d 636, 643 (2015)—involves genuine issues of disputed fact that must be resolved by a jury.

With respect to his conduct at the meeting of regional sales directors, it is undisputed that Mr. Gould used "colorful language," including vulgarities, at the meeting and referred to Ms. Adams as a

"tough b***h." (Doc. 139-1, Gould Dep. at 169:12-14, 170:12, 172:22-173:3.) But there is evidence that Mr. Gould's remarks were delivered in the context of a "locker room" "pep talk,"[33] and there also is evidence that, within the Interface culture, "a lot of [company] leaders talked like that." (Doc. 135-1, Adams Dep. at 170:1-8.) And as for the reference to Ms. Adams, Mr. Gould testified that he meant it as a compliment (Doc. 139-1, Gould Dep. at 170:13), and Ms. Adams acknowledged that she took it in that sense. (Doc. 135-1, Adams Dep. at 50:20-51:13, 52:6-13, 113:20-23, 167:6-10.) Viewed in this context, Mr. Gould's remarks and conduct at the meeting of regional sales directors cannot be deemed "willful misconduct" or "bullying" *as a matter of law*. To the contrary, whether his remarks and conduct amount to "willful misconduct" or "bullying" is for a jury to decide. *See Jackson,* 2011 U.S. Dist. LEXIS 63015, at *21 ("As a general matter, whether an employee acts unprofessionally or in a

---

[33] *Cf.* Connor Riley, *"I want to break them": Kirby Smart goes viral for incredible, profane Florida halftime speech,* DAWG NATION (Nov. 17, 2021), https://www.dawgnation.com/football/connor_in_coverage/kirby-smart-halftime-speech-florida/V3DPE35NDZH6ZMP6WU6DDX3QWE/ (last visited on Oct. 26, 2023).

manner that discredits his employer's 'reputation, character and standing' is a question of credibility that must be resolved by the jury.").

And about the encounter with Ms. Millsaps-Morris, the evidence is again hotly disputed. Ms. Millsaps-Morris testified that Mr. Gould loudly called her a "g*****n f***ing b***h" or a "f***ing g*****n b***h." (Doc. 143-1, Millsaps-Morris Dep. at 171:1-21.) Although her testimony was corroborated in some respects by Ms. Eanes (Doc. 136-1, Eanes Dep. at 127:21-128:1, 129:9-13), Ms. Adams was in close proximity to their conversation and never heard Mr. Gould refer to anyone as a "b***h." (Doc. 135-1, Adams Dep. at 58:24-60:24.) Mr. Gould testified unequivocally that he never said such things to Ms. Millsaps-Morris. (Doc. 139-1, Gould Dep. at 184:13-17.) And although the video recording of the encounter includes no audio, the demeanor of the parties depicted on the recording is not suggestive of an unfriendly encounter. (Doc. 160, Terranea_Media_000006.) The evidence on this issue presents a classic, "he said, she said" credibility question that requires a jury to resolve. *See Russell v. Bd. of Trs.,* 243 F.3d 336, 340 (7th Cir. 2001) ("[S]ummary judgment is a singularly inappropriate time to resolve a 'he said, she said' kind of dispute.").

LEGAL02/43330961v6

# CONCLUSION

For these reasons, the Court should reverse the award of summary judgment to Interface on Mr. Gould's claim for breach of his employment agreement, as well as his derivative claim for attorneys' fees.

Respectfully submitted,

*/s/ Keith R. Blackwell*
Keith R. Blackwell
  Georgia Bar No. 024493
John E. Stephenson, Jr.
  Georgia Bar No. 679825
Christopher C. Marquardt
  Georgia Bar No. 471150
Leigh R. Shapiro
  Georgia Bar No. 408330
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

LEGAL02/43330961v6

# CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,615 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by Microsoft® Word, the word processing software used to prepare this brief.

The undersigned hereby certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word, Century Schoolbook, 14 point.

*/s/ Keith R. Blackwell*
Keith R. Blackwell
  Georgia Bar No. 024493
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

LEGAL02/43330961v6

# CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

I further certify that I have caused a true and correct copy of this brief to be deposited in the United States Mail, postage prepaid and addressed as follows:

Stephen E. Hudson
Thomas M. Clyde
Lesli Nicole Gaither
Curtis Allen Garrett, Jr.
Brittany Nash
Kilpatrick Townsend & Stockton, LLP
1100 PEACHTREE ST STE 2800
ATLANTA, GA 30309

*/s/ Keith R. Blackwell*
Keith R. Blackwell
  Georgia Bar No. 024493
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

LEGAL02/43330961v6